UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRYL SCOTT,

        Plaintiff,

v.

        CASE NO. 14-CV-11557
        HONORABLE GEORGE CARAM STEEH

GENESEE COUNTY and JOEANN
CARRIGAN,

        Defendants.
_____/

OPINION AND ORDER GRANTING DEFENDANT GENESEE
COUNTY'S MOTION FOR SUMMARY JUDGMENT (DOC. #25)

Plaintiff Darryl Scott ("Scott") was shot in the knee by defendant JoeAnn Carrigan ("Carrigan"), a former Genesee County Parks Ranger and retired City of Flint police Detective/Sargent. The shooting occurred while Carrigan was off duty at a Laundromat with her ex-husband. Someone stole Carrigan's purse from the Laundromat. She and her ex-husband pursued the thief in their vehicle. After losing sight of the thief, Carrigan saw Scott and believed that he resembled the thief. Carrigan shouted from the passenger side of her vehicle for Scott to stop and that she was a police officer. She shot at him multiple times using her county-issued firearm, hitting him once in the knee. It turned out that Scott was not the thief.

Scott brought this lawsuit against Carrigan and Genesee County (the "County") alleging excessive force, assault and battery, intentional infliction of emotional distress and violation of County policies. Now before the Court is the County's motion for summary judgment (Doc. #25). The County argues that it cannot be liable for Carrigan's actions

-1-

undertaken while she was off duty, not in uniform, and in her personal capacity. The court heard oral argument on December 1, 2015. For the reasons that follow, the County's motion will be granted.

## I. BACKGROUND

Defendant Carrigan retired as a City of Flint police Detective/Sargent in 2006. (Carrigan Dep. 25:6). After her retirement from the police force, she applied for and was offered a job as a Genesee County park ranger. (*Id.* 27:15–17). As a prerequisite for the park ranger job, Carrigan was required to be a certified police officer. (*Id.* 28:10–14). In addition, because park rangers carry firearms, Carrigan received weapons training including classes and shooting simulation. (*Id.* 30:15–22).

Carrigan's duties as a County park ranger included patrolling the County's parks and working with surrounding police departments, such as the City of Flint and Mount Morris Police Departments. (*Id.* 34:8–15).

### A. The October 30, 2013 Incident

This action concerns Carrigan's actions on October 30, 2013. Carrigan did not work that day. (*Id.* 68:20–23). That evening, Carrigan was trick-or-treating at Crossroads Village, a recreational park in Genesee County. (*Id.* 65:15–66:4). She carried her work-issued handgun in her purse. (*Id.* 67:9–20). However, at some point, she moved the gun from her purse onto her person holstered on her waist. (*Id.* 72:1–22).

Sometime after leaving the park, Carrigan and her husband arrived at the Laundromat on Clio street south of Pierson street to wash her husband's clothes. (*Id.* 68:4–8; 66:25). While she was helping her husband fold clothes, Carrigan placed her purse on a counter by the dryers. (*Id.* 71:10–11, 74:9–15). During this time, a black male

wearing a light-colored shirt and jeans walked into the Laundromat, ran past Carrigan, grabbed her purse and ran outside from the front door. (*Id.* 74:13–75:5, 75:20–76:4). Carrigan yelled, "[h]e grabbed my purse. He's got my – call the police." (*Id.* 76:22–24).

Through the windows of the Laundromat, Carrigan saw an individual run around the building down Pierson street. (*Id.* 78:2). Carrigan also was alerted to the thief's accomplices — multiple lookouts. (*Id.* at 81:1). Carrigan and her husband ran outside and immediately entered their car to pursue the thief and his accomplices. (*Id.* at 78:24–79:13). After driving around, Carrigan and her husband saw people running, and, eventually, they scattered. (*Id.* at 83:24–84:6). Carrigan and her husband made their way back to the Laundromat parking lot. (*Id.* at 82:18–21). Carrigan testified that, at that point, the Laundromat attendant told her she saw the person who stole her purse, stating, "[t]here he goes, the one that's down the street[.]" (*Id.* 84:13–22, 85:13–4). Carrigan saw the gentleman who resembled the person who took her purse walking toward the Popeye's restaurant down the street from the Laundromat. (*Id.* 82:20–21, 87:18–20). She and her husband then drove south on Clio road towards the Popeye's restaurant. (*Id.* 87:24–88:3). Her husband was driving and she was sitting in the front passenger seat.

Carrigan and her husband reached the person she believed stole her purse, encountering the plaintiff, Darryl Scott. (*Id.* 88:17–18). Carrigan and Scott testified differently as to what occurred next.

Carrigan says that, as she and her husband drove up to Scott, remaining in the vehicle, she told Scott that she wanted to talk to him. (*Id.* 88:13–14). According to Carrigan, Scott then took off running. (*Id.* 88:13–14). Carrigan yelled at Scott to stop and that she was a police officer. (*Id.* 90:6–7). Carrigan testified that Scott started taking his

-3-

shirt off and running around the Popeye's building. (*Id.* 90:17–21). Carrigan told her husband to follow Scott, and they circled the building in their vehicle two to three times. (*Id.* 91:9). As they were doing this, Carrigan pulled out her handgun and shot one or two rounds in the air, telling Scott to stop. (*Id.* 92:13–17, 92:25–93:2, 96:15). Carrigan continued yelling, "[p]olice, stop[.]" (*Id.* 93:4–5). Eventually, Scott stopped and was trying to get into Popeye's. (*Id.* 90:15–16). Carrigan and her husband pulled up in the parking lot in pursuit of Scott, and Carrigan was continuing to say, "[s]top, stop. Police." (*Id.* 92:6–7, 94:17–18). At that point, Carrigan says she saw Scott reach for something with his right hand; she saw what she believed to be a weapon in his hand. (*Id.* 93:10–24). He raised his hand up causing Carrigan to fire her weapon "[d]own toward the ground." (*Id.* 94:17–95:3). Scott was hit in the leg with one bullet and fell to the floor. (*Id.* 95:17–18, 98:5–17). Carrigan approached him and saw that he had a cell phone, not a weapon. (*Id.* 101:9–16). Carrigan asked Scott where her purse was; Scott replied that he did not have her purse. (*Id.* 101:23–24). Carrigan waited for the police to arrive. (*Id.* 101:25–102:1).

Five shell casings were found during the investigation. Carrigan does not recall firing her weapon two additional times, but testified that "[t]hose other shots I thought were fired around when I was – when they were going through the woods and through the houses, running." (*Id.* 97:10–13).

Scott's testimony is different than Carrigan's testimony. Scott recalls that on the afternoon of October 30th, he was released from a psychiatric hospital and went to his nephew's house. (Scott Dep. 56:13–57:14). At his nephew's house, he smoked marijuana and crack cocaine. (*Id.* 58:14–59:5). He was then picked up by a second nephew. (*Id.* 61:11–13). At some point, the second nephew drove Scott down the street from Scott's

cousin's house in a neighborhood four or five streets away from the Laundromat. (*Id.* 64:17–18). Scott walked to his cousin's house where he smoked marijuana and drank. (*Id.* 67:11–15). When they ran out of marijuana, Scott called another cousin to bring over some marijuana. (*Id.* 68:6–13). Scott's cousin came to the house to drop off the marijuana. (*Id.* 74:9–12). Scott entered the vehicle with his cousin, obtained the marijuana and drove down the street. (*Id.* 74:14–17). It was approximately 9:00 p.m. by this time, and it was dark outside. (*Id.* 78:17–21). His cousin was in a hurry to leave so he dropped Scott off down the street.

As Scott walked back to his cousin's house on Canterbury road, carrying only the marijuana he purchased and his cousin's cell phone in his pocket, the vehicle driven by Carrigan's husband drove towards Scott causing him to jump on the sidewalk. (*Id.* 81:22, 85:21–25). Carrigan then yelled loudly that she was police and for Scott to freeze. (*Id.* 87:8–21). Scott says he froze and put his hands up, but, all of a sudden, Carrigan "just start[ed] shooting." (*Id.* 88:16–17). Scott contends that Carrigan did not warn him that she was going to shoot; "[s]he just yelled police, stop, freeze, and then she started shooting." (*Id.* 90:5–6). After Carrigan started shooting at Scott, he took off running towards Clio Road. (*Id.* 92:18–93:8). Eventually, Scott made it to Popeye's restaurant where he says he "kicked on their door for like four or five minutes." (*Id.* 95:3–4). However, Popeye's was closed. (*Id.* 96:18–23).

Because he could not get into Popeye's, Scott states that he pulled out his cell phone to dial 911, but he was too nervous to dial the numbers. (*Id.* 97:13–24). Scott then saw Carrigan's vehicle driving towards him from the Laundromat down the street.

(*Id.* 98:7–18).  Scott ran around the Popeye's restaurant two-to-three times chased by Carrigan's vehicle.  (*Id.* 99:14–101:24).  Scott explained:

> They're chasing me in the vehicle around the building.  I know if I leave the building I got a good chance of dying but if I stay close to the building and I keep making a circle and by them being in a vehicle, you know, they got to make a wider circle and it's going to take them a little second and hopefully something will give before I get tired or whatever, something to give.  So I'm running this way and they chasing me right around, she's going right around the building chasing me around the building shooting at me, shooting at me.

(*Id.* 102:2–11).  Scott recalls Carrigan shooting at him at least four-to-six times while he was running around the building.  (*Id.* 102:17–20).

Eventually, while he was near the back of the Popeye's building, Scott says he was hit by a bullet from Carrigan's gun.  (*Id.* 103:6–14).  Scott remembers continuing to run after he was shot, ultimately falling down in nearby bushes.  (*Id.* 103:16–18).  Scott says that Carrigan then stood over him asking where her purse was, threatening to "kill [him] right here right now."  (*Id.* 92:1–3).  Further, Scott recalls Carrigan yelling, "I'm going to kill you, I'm going to kill you, police, I'm going to kill you."  (*Id.* 104:6–7).  Scott testified that Carrigan's husband jumped on his back, while Carrigan was threatening him:

> Whoever the driver was got out, got out after I got down and I crawled back this way a little bit trying to still get away, he jumped out of the vehicle, he put it in park and jumped out of the vehicle, he jumped on my back, put my hands behind my back.
>
> * * * *
>
> He was like call the police.  And she got out, she was so crazy and enraged, she's like fuck that, I am the police, where's my purse, tell me where my purse is or I'm going to kill you right here right now.  The only thing that stopped that lady from killing me was Flint Police pulled up[.]

(*Id.* 105:4–16).  Police officers from the Flint Police Department and State Police arrived; Scott was transported to the hospital.

-6-

Carrigan was criminally charged and pleaded no contest to assault with intent to do great bodily harm less than murder. (Carrigan Dep. 7:14–16). Carrigan was sentenced to probation and community service. (*Id.* 5:4–9).

B. The County's Policies

The County has policies and procedures for the use of deadly force and firearms. (Mot. for Summ. J., Exhibit C). These policies and procedures forbid the use of weapons "for any purpose other than approved range training, performance of duties, or as otherwise provided by law." (*Id.* at 2). Moreover, there are specific procedures for carrying a weapon while off-duty:

> **OFF-DUTY USE OF FIREARMS**
> Rangers are not required to carry weapons off-duty. Rangers who are authorized pursuant to Michigan Law to carry a weapon while off-duty do so at their own discretion. ***However, should a member elect to go armed he/she must carry their Ranger identification card when acting under the authority of the Commission. When wearing civilian clothes on or off-duty, members shall conceal the firearm from public view except at crime scenes when wearing proper Ranger identification.*** All Rangers are notified that they are personally responsible for any misuse of a weapon while off-duty and will be disciplined for such misuse.

(*Id.* at 3) (emphasis in original).

C. This Lawsuit

Scott filed this action against Carrigan and the County alleging: Count I- excessive force against Carrigan under 42 U.S.C. § 1983; Count II- municipal liability against the County under 42 U.S.C. § 1983; Count III- assault and battery against Carrigan; and Count

-7-

IV- Intentional Infliction of Emotional Distress against Carrigan and the County under a vicarious liability theory.

The County seeks summary judgment on Counts II and IV. (Doc. #25). Scott opposes the County's motion. (Doc. #27). The County has filed a reply. (Doc. #28). The court held oral argument on December 1, 2015. The County's motion is ready for decision. The court's decision follows.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distrib. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532

(6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence from which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### III. DISCUSSION

The County seeks summary judgment on the municipal liability claim (Count II) and the intentional infliction of emotional distress ("IIED") claim (Count IV). The court discusses each claim in turn.

A. Municipal Liability (Count II)[1]

---

[1] As a threshold matter, the County argues that it cannot be liable under 42 U.S.C. § 1983 because Carrigan was not acting under color of state law when she allegedly used excessive force against Scott. Scott responds that, although Carrigan was off-duty, she identified herself as a police officer, was carrying her firearm and claimed to act on official police authority. Thus, Scott argues that Carrigan was acting under color of state law. The court need not decide this issue to resolve the instant

Scott seeks to hold the County liable for Carrigan's alleged use of excessive force under a municipal liability theory. Specifically, the complaint alleges that the County's "policy, custom, practice, and/or common practice . . . to inadequately screen applicants for hire, inadequately train, and inadequately supervise its officers including the Defendant officer Carrigan, [resulted in a] blatant violation of Plaintiff's constitutional rights." (Doc. #1 at 6). In response to the County's motion for summary judgment, Scott narrows his argument: he contends that Carrigan's actions demonstrate an obvious lack of training tantamount to deliberate indifference. (Doc. #27 at 10–12).

To impose liability against a municipality or other local government, the plaintiff must establish that the governmental body's own illegal acts subjected a person to a deprivation of rights or caused the person to be subjected to such deprivation. *Connick v. Thompson*, 563 U.S. 51; 131 S.Ct. 1350, 1359 (2011); *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986). A municipality is not vicariously liable under 42 U.S.C. § 1983 for the actions of its employees. *Connick*, 131 S.Ct. at 60–61 (citations omitted).

Scott seeks to hold the County liable on a theory of an obvious lack of training amounting to deliberate indifference. The Supreme Court has explained this theory of liability:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous

---

motion. Assuming, without deciding, that Carrigan was acting under color of state law, Scott fails to establish a genuine issue of material fact that the County is liable under a municipal liability theory.

> where a claim turns on a failure to train. See *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23, 105 S.Ct. 2427 (1985) (plurality opinion) ("'[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."
>
> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities. . . .

*Id.* at 60–61 (internal citations omitted). The Court has made clear that a showing of "obviousness," as opposed to showing a pattern of violations, occurs in only "a narrow range of circumstances." *Id.* at 63.

Scott argues that, in this case, the need for additional training, supervision and monitoring was "clearly needed." (Doc. #27 at 11). He contends that the County failed to adequately train its officers to prevent situations like this from occurring. Thus, Scott avers that, "[w]hen such a simple mistake can so obviously lead to a criminal violation, it can be inferred that the municipality was . . . deliberately indifferent to the risk as a matter of law." (*Id.* at 12).

Scott has failed to establish a genuine issue of material fact that the County provided inadequate training, and that the obvious consequence of that inadequate training was a risk that off-duty officers would violate the constitutional rights of citizens. First, Scott has

not shown that the County's training of its park rangers — specifically Carrigan — was inadequate. The County trains its officers when they begin employment as park rangers, and, as explained, all park rangers are certified police officers. Carrigan, a retired City of Flint detective, testified that she received continuous training as a ranger. In addition, the County maintains and enforces specific policies regarding the use of firearms, including the use force and use of firearms off-duty. Particularly relevant to this case is the County's policy restricting individuals who may properly carry their County-issued firearms off-duty: those persons have to otherwise be permitted to carry the firearm under Michigan law. These persons, in order to obtain the ability to carry a concealed firearm, are familiar with the requirements under Michigan law and receive firearms training. The County's policy alerts the officer that he or she will be liable for the misuse of a weapon while off-duty. Scott has simply failed to establish that the County inadequately trained its rangers.

Second, Scott has not offered any evidence establishing that, if there were an inadequacy in the County's training, there was an obvious risk that an off-duty ranger would violate the constitutional rights of citizens. As explained above, off-duty rangers who carried their County issued firearm were required otherwise possess the ability to carry the firearm under Michigan law. Moreover, rangers are subjected to background checks prior to beginning their employment with the County. Indeed, all park rangers are required to be certified police officers. Thus, it was not obvious that allowing an off-duty ranger to carry his or her County-issued firearm (by meeting the requirements under Michigan law to carry a concealed firearm) would violate the law when using the firearm off-duty. It follows that there was no obvious risk that an off-duty ranger would violate the constitutional rights of citizens by virtue of having the ability to carry his or her firearm off-duty.

Supreme Court case law supports the court's conclusion that no question of material fact exists as to whether the County was deliberately indifferent. In *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, the Supreme Court held that a county's failure to screen a police officer's background before hiring him, including a criminal history check, did not amount to deliberate indifference, and that the police officer's use of excessive force was not a plainly obvious consequence of the county's failure to screen. 520 U.S. 397, 409 (1997). The Court reasoned that "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412 (emphasis in original). The Court concluded that the simple fact the officer had various misdemeanor infractions on his record "may well have made him an extremely poor candidate for reserve deputy." *Id.* at 414. However, the Court explained that, to hold the county liable, the screening of the officer before the hiring decision was made must have led to the conclusion that the officer's use of excessive force "would have been a plainly obvious consequence of the hiring decision." *Id.* at 415. The Court held that there was insufficient evidence for a jury to conclude that the hiring decision "reflected conscious disregard of an obvious risk that a use of excessive force would follow." *Id.*

Here, like *Brown*, there is insufficient evidence for a jury to conclude that any failure to train Carrigan led to the obvious risk that she would use excessive force. Indeed, the evidence shows the opposite. She was a former police officer, received additional training from the County as a ranger, and held a valid license to carry a concealed firearm in Michigan.

In another case, *Connick v. Thompson*, the Supreme Court concluded that the failure of a prosecutor's office to train its attorneys on *Brady* violations was not so obvious to lead to the constitutional violation of defendants' rights. 563 U.S. 51. The Court explained:

> Failure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton's* hypothesized single-incident liability. The obvious need for specific legal training that was present in the *Canton* scenario is absent here. Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances, there is an obvious need for some form of training. In stark contrast, legal "[t]raining is what differentiates attorneys from average public employees."
>
> * * * *
>
> In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the "obvious consequence" of failing to provide prosecutors with formal in-house training about how to obey the law.

*Id.* at 64 (citations omitted).

Scott's claim against the County is unlike the claim in *Canton* and similar to the claim in *Connick*. The use of force against Scott was not an obvious consequence of the alleged failure to train Carrigan further on the intricacies of carrying a firearm off duty, given Carrigan's background (a former police officer who had received additional training from the County as a ranger, in addition to being licensed under Michigan law to carry a concealed firearm).

Scott has simply failed to meet his burden in establishing a genuine issue of material fact regarding the County's liability under 42 U.S.C. § 1983. Scott's opposition to the

County's motion for summary judgment is conclusory without pointing to any supporting evidence. The County is entitled to summary judgment on the municipal liability claim.

B. State Law Claim – Count IV

At oral argument, Scott withdrew the intentional infliction of emotional distress claim as alleged against the County. Accordingly, Count IV is dismissed.

## IV. CONCLUSION

For the reasons explained above, the County's motion for summary judgment is GRANTED. Counts II and IV of Scott's complaint are DISMISSED against the County. This action proceeds against Carrigan, only.

IT IS SO ORDERED.

Dated: December 4, 2015

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on December 4, 2015, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk